**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| DEWAYNE A. VANSCHOYCK | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:08-CV-350-JVB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Dewayne Vanschoyck seeks judicial review of the final decision of Defendant Michael Astrue, Commissioner of Social Security, who denied his application for Disability Insurance Benefits and Supplemental Security Income Benefits under the Social Security Act. For the following reasons, the Court affirms the Commissioner's decision.

## A. Procedural Background

On August 9, 2004, Plaintiff filed an application for Disability Insurance Benefits, alleging disability since July 19, 2004. Plaintiff's application was denied on February 2, 2005, and again upon reconsideration on April 7, 2005. Plaintiff then filed a timely request for a hearing before an administrative law judge. On May 10, 2007, a hearing was held in South Bend before Administrative Law Judge Frederick McGrath ("the ALJ"). Plaintiff appeared with attorney Gary Davis and testified at the hearing. Vocational Expert Joseph Havranek ("the VE") and Plaintiff's stepsister, Jody Kampf, also testified.

In a decision dated August 23, 2007, the ALJ denied Plaintiff's application for disability benefits. The ALJ found as follows:

> 1.The claimant meets the insured status requirements of the Social Security Act through March 31, 2008.
>
> 2. The claimant has not engaged in substantial gainful activity since July 19, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairments: a history of a cerebrovascular accident in July 2004; moderate degenerative disc disease in the lower lumbar spine; an unspecified cognitive disorder; and, a history of alcohol, cocaine and cannabis use (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in the Social Security Regulations and Rulings but finds that the claimant is limited to unskilled work.
>
> 6. The statements by the claimant and his witness concerning the intensity, persistence and limiting effects of his symptoms are not entirely consistent with or fully supported by the medical and other evidence of record, nor by his course of conduct (SSR96-7p).
>
> 7. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
>
> 8. The claimant was born on March 10, 1964, and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).
>
> 9. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).
>
> 10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

12. The claimant has not been under a disability, as defined in the Social Security Act, from July 19, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

On September 6, 2007, Plaintiff filed a timely request for review with the Appeals Council of the Social Security Administration. However, on April 23, 2008, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. After an extension was granted by the Appeals Council, Plaintiff filed a complaint with this Court on July 29, 2008.

**B. Facts**

**(1) *Plaintiff's Background***

Plaintiff was born on March 10, 1964. Plaintiff completed his GED, is divorced, and has two children. His employment history includes work as an inspector (1985–1992), utility man (1992–1995), and as a laborer and mason (1996–2004). However, Plaintiff has not worked since July 19, 2004.

**(2) *Medical Evidence***

In 2003 and early 2004, Dr. Daniel E. Edquist treated Plaintiff for bronchitis and muscular back spasms (Tr. 279–283).

On July 19, 2004, Plaintiff was admitted to LaPorte Hospital after experiencing slurred speech, blurry vision, and impaired coordination (Tr. 137–40). A CT indicated

decreased signal intensity, and an EEG was abnormal, indicating an underlying structural lesion and focal dysrhythmia (Tr. 140, 148). Dr. Martin J. Murphy diagnosed Plaintiff with left hemispheric infraction, spastic hemiparesis with hemihypertrophy secondary to perinatal cerebral disease, chronic alcoholism, chronic obstructive pulmonary disease, and alcohol, tobacco, and marijuana abuse (Tr. 137–40). Dr. Murphy noted that Plaintiff drank between six to twenty-four beers per day for the last twenty years. Dr. Murphy also noted that Plaintiff smoked for the past twenty-nine years and regularly smoked ten or more joints of marijuana per day (Tr. 137–40). Plaintiff was discharged on July 20, 2004 (Tr. 137).

The following day, Plaintiff was admitted to Memorial Hospital of South Bend due to weakness on his right side, dysarthria, blurry vision, and pain behind his left eye (Tr. 163, 183). While at the hospital, he needed stand by assistance for sitting and standing (Tr. 206). Dr. Seth Spanos noted that Plaintiff's reflexes were intact, and although there was a slight decrease in grip strength on his right side, his strength was 5/5 (Tr. 183). A CT showed hypodense area in Plaintiff's left hemisphere, and an MRI indicated a left cerebral area consistent with a recent stroke (Tr. 178). An ultrasound on July 22, 2004, "showed left carotid artery near occlusion" (Tr. 178). Dr. Natalie VanDeventer noted that Plaintiff had a history of tobacco, alcohol, marijuana, and cocaine abuse (Tr. 178). Dr. VanDeventer prescribed Plaintiff Aggrenox to prevent future strokes and recommended that he stop smoking, abstain from illicit substances, and follow up with a surgeon regarding the carotid ultrasound findings (Tr. 178–180). Plaintiff declined assistance for smoking cessation (Tr. 179). He was discharged on July 22, 2004 (Tr. 178).

Plaintiff saw Dr. Edquist five days later (Tr. 274–75). Dr. Edquist noted that Plaintiff's slurred speech and right side weakness had improved (Tr. 275). However, Dr. Edquist opined that Plaintiff was still "a little weak in his grip on the right side" and had "a little clumsiness with finger to nose in the right upper extremity" and weakness in his right leg (Tr. 274). Dr. Edquist made arrangements for Plaintiff to meet with Dr. Charles E. Petersen, a vascular surgeon, to evaluate Plaintiff's occluded left carotid artery (Tr. 274).

Plaintiff met with Dr. Petersen on August 9, 2004 (Tr. 227). Dr. Petersen noted that Plaintiff was recovering from a stroke and had a complete occlusion of his left carotid artery (Tr. 227). Dr. Petersen also noted that Plaintiff still had "some difficulty with fine motor control of his right arm but otherwise [was] having no difficulties" (Tr. 227). In a letter to Dr. Edquist, Dr. Petersen stated that Plaintiff had "recovered to a great degree but . . . still [had] some mild motor dysfunction in his right hand" (Tr. 228). Dr. Petersen recommended that Plaintiff's occluded artery be treated with continued anti-platelet aspirin therapy rather than surgery (Tr. 227–28).

On August 20, 2004, Dr. Edquist noted that Plaintiff was receiving physical therapy and gradually getting better (Tr. 271). Specifically, Dr. Edquist opined that Plaintiff's coordination and strength in his left leg had increased, but Plaintiff was not ready to return to construction work (Tr. 271). Dr. Edquist also noted that Plaintiff's speech and hand grip had improved (Tr. 271).

On August 29, 2004, Plaintiff had an echocardiogram and stress test, which indicated a mild to moderate limitation in functional capacity (Tr. 269). Plaintiff did not

report symptoms of chest pain, and his blood pressure response to exercise was normal (Tr. 269).

Plaintiff attended speech therapy in September 2004 (Tr. 232). At the time of his discharge on September 14, 2004, Plaintiff continued to have cognitive-communication deficits (Tr. 232). Plaintiff did not complete any homework assignments because "he [didn't] have time or want to complete homework" (Tr. 232).

Plaintiff also attended occupational therapy and was eventually discharged on September 3, 2004 (Tr. 235–38). As a result of the therapy, Plaintiff indicated that things were becoming easier; he no longer had problems brushing his teeth or picking up small objects (Tr. 236, 238). Plaintiff's occupational evaluation rated the range of movement and strength in his left shoulder, wrist, fingers, elbow, and forearm as 5/5, and, similarly, he received an evaluation of 5/5 for range of movement and 4/5 for strength on his right side (Tr. 235, 237). Occupational Therapist Nikole Meredith opined that Plaintiff "did not have any problems with fine motor skills" (Tr. 237–238). She also indicated that Plaintiff could independently perform the following daily activities: upper extremity dressing, lower extremity dressing, feeding, grooming and hygiene, household tasks, bed mobility, transfer, bathing, and toileting (Tr. 237–38).

On November 18, 2004, Dr. Ralph E. Inabnit conducted a consultative examination (Tr. 243–54). Dr. Inabnit indicated that Plaintiff's motor strength was 4/5 in the lower and upper extremities (Tr. 250). He also noted that Plaintiff's finger-to-nose, heal-to-shin, and casual walk were normal but his toe and heel walk was clumsy (Tr. 250). Dr. Inabnit opined that Plaintiff's symptoms after suffering his stroke "basically resolved over a period of time" (Tr. 252). Dr. Inabnit also concluded that "there is not

much there in terms of gross motor weakness to either his upper or lower extremity on the right side" (Tr. 254). Dr. Inabnit recommended that Plaintiff undergo an annual carotid Doppler, a 12-lead electrocardiogram and HDL profile, and "a neuropsychological evaluation due to possible cognitive loss" (Tr. 254). Dr. Inabnit was also concerned about Plaintiff's alcohol and drug abuse (Tr. 254).

On November 23, 2004, Dr. John T. Heroldt and Dr. Mary A. Miller conducted a consultative psychological evaluation, including a mental status evaluation and a Wechsler Memory Scale (WMS) test (Tr. 255–60). Dr. Heroldt opined that Plaintiff did not have any difficulty interacting, was able to attend to tasks, answer simple questions, and follow directions (Tr. 256). Plaintiff received a Global Assessment of Functioning (GAF) score of 50 (Tr. 257). Plaintiff's WMS scores fell in the borderline range of functioning (Tr. 257). According to Dr. Miller, the WMS scores indicated that Plaintiff "may have been experiencing some memory problems but not of a serious nature" (Tr. 257).

Plaintiff saw Dr. Edquist on December 8, 2004 (Tr. 265). Dr. Edquist diagnosed Plaintiff with carotid atherosclerosis with a totally occluded internal artery, abnormal stress echo, continued cigarette use, and hyperlipidemia (Tr. 265).

On December 14, 2004, Dr. David J. Gorecki performed a cardiology consultation to evaluate Plaintiff's complaints of chest pain and an abnormal stress echo (Tr. 288–89). Dr. Gorecki recommended that Plaintiff undergo a cardiac catheterization, but Plaintiff refused due to financial reasons (Tr. 288). Dr. Gorecki indicated that Plaintiff was, neurologically, grossly intact and without focal deficit (Tr. 289). Dr. Gorecki advised Plaintiff that "the single best thing he [could] do for himself would be to quit smoking"

(Tr. 289). On a December 27, 2004, follow-up visit, Dr. Gorecki indicated that Plaintiff continued to smoke and that Plaintiff refused smoking cessation aids (Tr. 287). Dr. Gorecki also noted that Plaintiff was thinking about catheterization (Tr. 287).

On January 31, 2005, Dr. B. Whitley, a state agency reviewing physician, conducted a Physical Residual Functional Capacity Assessment (Tr. 292–99). Dr. Whitley opined that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour workday (with normal breaks), and push or pull without limitations (Tr. 293). Dr. Whitley also opined that Plaintiff could frequently climb ramps and stairs, stoop, and kneel and could occasionally climb ladders, ropes, and scaffolds, balance, crouch, and crawl (Tr. 294). Dr. Whitley indicated that Plaintiff could frequently handle and finger with his right upper extremity and that his ability to reach and feel in all directions was unlimited (Tr. 295). Dr. A. Lopez reviewed and affirmed Dr. Whitley's findings on March 30, 2005 (Tr. 299).

On February 3, 2005, another state agency reviewing physician, Dr. R. Klion, conducted a Psychiatric Review (Tr. 300–13). Dr. Klion opined that Plaintiff suffered from a cognitive disorder and cannabis abuse, causing moderate limitations in concentration, persistence, and pace and daily activities and mild limitations in social functioning (Tr. 310). Dr. Klion also opined that Plaintiff spoke relevantly and coherently and was able to attend to tasks, answer simple questions, and follow directions (Tr. 312). Dr. Klion noted that Plaintiff prepares meals, goes shopping once a week, visits his uncle once or twice a week, tinkers in his uncle's garage, watches television, and plays with his dog (Tr. 312).

The same day, Dr. Klion completed a Mental Residual Functional Capacity Assessment form (Tr. 314–16). Dr. Klion opined that Plaintiff would likely have difficulty understanding, remembering, and carrying out detailed tasks and maintaining concentration at times (Tr. 316). Dr. Klion indicated that, despite these limitations, Plaintiff had the capacity to carry out and sustain simple, repetitive tasks (Tr. 316). In April 2005, Dr. Pressner, a state agency reviewing psychologist, reviewed and affirmed Dr. Klion's findings (Tr. 316).

Plaintiff underwent catheterization on February 15, 2005, which revealed non-occlusive coronary artery disease and diastolic dysfunction (Tr. 322–23).

The same day, plaintiff saw Dr. Edquist for back pain and depression associated with his inability to obtain Social Security benefits (Tr. 340). Dr. Edquist noted that the pain was positional and that Plaintiff had a hard time standing up straight. Dr. Edquist urged Plaintiff to seek physical therapy for the back pain, but Plaintiff refused to do so (Tr. 340). As an alternative, Dr. Edquist instructed Plaintiff to complete stretching exercises (Tr. 340). Dr. Edquist prescribed Naprosyn, Flexeril, and Wellbutrin (Tr. 340). Dr. Enquist indicated that Plaintiff was "really not motivated to do much to care for his current problems" (Tr. 340).

On March 23, 2005, Plaintiff saw Dr. Edquist for a follow-up visit (Tr. 338). Plaintiff was still experiencing back pain (Tr. 338). Plaintiff indicated to Dr. Edquist that he stopped taking Wellbutrin because it was not helping him (Tr. 338). Dr. Edquist prescribed Plaintiff Darvocet and asked him to get an MRI (Tr. 338).

Six days later, Plaintiff went to the emergency room, complaining of lower back pain (Tr. 329–30). Plaintiff was prescribed Lortab and was referred to Dr. Charles Motley (Tr. 329).

Plaintiff received an MRI on April 2, 2005, revealing moderate degenerative disk disease in the lower lumar spine, a diffuse disk extrusion at L3-4, and a mild diffuse disk bulge at L4-5 (Tr. 337).

On April 14, 2005, Dr. Thomas R. Keucher, a neurosurgeon, treated Plaintiff for his back problems (Tr. 343). Dr. Keucher noted that Plaintiff's symptoms were primarily manifested as muscle spasms and tightness (Tr. 343). Dr. Keucher refilled Plaintiff's Flexeril prescription and also prescribed him Vicodin (Tr. 343). Dr. Keucher also showed Plaintiff stretching exercises to help his back (Tr. 343).

Plaintiff met with Dr. Keucher for a follow-up visit on May 5, 2005 (Tr. 345). Dr. Keucher indicated that Plaintiff was "quite a bit looser" and "walking a great deal more" (Tr. 345). After noting that Plaintiff's pain level had decreased, Dr. Keucher instructed Plaintiff to continue his stretching exercises (Tr. 345).

On June 7, 2005, Dr. Motley saw Plaintiff for left arm numbness and paresthesis, shoulder aching, and tingling fingers (Tr. 388–89). Dr. Motley prescribed Mobic (Tr. 389). Plaintiff's symptoms remained on June 21, 2005 (Tr. 386–87).

On July 13, 2005, Plaintiff saw Dr. William C. Biehl, III, an orthopedic surgeon (Tr. 384–85). Dr. Biehl noted slight tenderness in Plaintiff's cervical spine and lumbosacral area (Tr. 384). Plaintiff's strength in his upper and lower extremities was 5/5 (Tr. 384). X-rays showed minimal degenerative disc change at C5-6, multiple degenerative disc changes and some facet arthritis in his lumbar spine, and moderate disc

extrusion at L3-4 (Tr. 385). Dr. Biehl recommended that Plaintiff continue conservative treatment because he was only experiencing "slight low back pain" and did not want surgical intervention (Tr. 385).

On December 6, 2005, Plaintiff saw Dr. Motley for blurry vision, weakness in his right arm and hand, and sleeping problems (Tr. 377). Dr. Motley opined that Plaintiff had diastolic hypertension, cervical arthritis, stress, sleep disturbances, and tobacco use disorder (Tr. 370, 377).

On June 26, 2006, Plaintiff indicated that he felt "ok" except for some foot pain (Tr. 351). Dr. Motley noted that Plaintiff had increased thyroidism (Tr. 351). On July 12, 2006, Dr. Mary Schwartz indicated that Plaintiff's pain had subsided without formal treatment and that Plaintiff reported that he was "participating in all activities without complications" (Tr. 349).

On August 9, 2006, Plaintiff reported to Dr. Motley that he felt much better (Tr. 347). Dr. Motley noted that Plaintiff was not experiencing vertigo and that his blood pressure had improved (Tr. 347). Dr. Motley opined that Plainiff had borderline hyperthyroidism and anxiety (Tr. 347).

On May 2, 2007, Dr. Nasar Katariwala, a neurologist, completed a Medicaid disability form (Tr. 400–06). Dr. Katariwala noted that it was his first time treating Plaintiff and that he did not perform any tests (Tr. 401). Dr. Katariwala opined that Plaintiff had a stroke and chronic pain syndrome, but he did not know when the conditions originated or began to affect Plaintiff's work (Tr. 404). When evaluating Plaintiff's nervous system, Dr. Katariwala indicated that Plaintiff's only problem was mild right hemiparesis (Tr. 403). Dr. Katariwala also noted that Plaintiff was moderately

limited in sitting, grasping, and manipulating and was significantly limited in standing, walking, lifting, pushing, pulling, bending, squatting, crawling, and climbing (Tr. 406). Dr. Katariwala concluded that Plaintiff was permanently disabled, but he did not provide a basis for this conclusion as requested by the form (Tr. 405).

**(3)** *Plaintiff's Administrative Hearing*

On May 10, 2007, the ALJ convened a hearing in South Bend at which Plaintiff appeared with his attorney, Gary Davis.

(a) Plaintiff's Testimony

Plaintiff testified that he could not work because he could not stand and sit for long periods of time due to his back pain. Plaintiff also testified that he has pain that comes and goes in his left side because of a pinched nerve.

When asked about the problems caused by his stroke, Plaintiff first testified that he became depressed because he was used to working and making his own money. Plaintiff stated that he now walks with a limp and his right arm is not as strong as it used to be. Plaintiff also testified that sometimes his left arm goes numb and he often becomes dizzy. When asked if he has problems with his left leg, Plaintiff answered, "I guess. I don't know" (Tr. 425). After being asked specifically if he experiences numbness in his left leg, Plaintiff answered affirmatively. Plaintiff also stated that he has had problems concentrating since his stroke.

Plaintiff then indicated that he has problems with his shoulder in bad weather because he broke it many years ago. Plaintiff also testified that he takes medication for high blood pressure and asthma.

When asked about his daily activities, Plaintiff testified that he lets his dogs out, cuts grass on his riding lawn mower, and does the dishes. Plaintiff stated that he takes breaks between these activities because his back gets sore.

(b) Witness Testimony

Plaintiff's stepsister, Jody Kampf, testified that Plaintiff's inability to read, depression, and grouchiness affect his ability to obtain employment. She also opined that Plaintiff was not in good health and does not function well.

(c) VE Testimony

The ALJ first asked the VE whether there were any jobs limited to light unskilled work for an individual of the same age, education, and work background as Plaintiff. The VE responded affirmatively, indicating that there were 750 to 1,000 jobs as a collator operator, 1,500 to 2,000 jobs as a laundry sorter, and 6,000 to 8,000 jobs as a hand packager in the state of Indiana.

The ALJ next asked the VE whether there were any jobs limited to sedentary unskilled work for an individual of the same age, education, and work background as Plaintiff. The VE again responded affirmatively, indicating that there were about 1,000 jobs as a microfilm document preparer, 200 to 300 jobs as a brake line coater, and 400 to 500 jobs as a cable worker in the state of Indiana.

**(4)** *The ALJ's Decision*

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

The ALJ determined that Plaintiff's severe impairments included: a stroke in July 2004; moderate degenerative disc disease in the lower lumbar spine; an unspecified cognitive disorder; and a history of alcohol, cocaine, and cannabis abuse.

Plaintiff's condition, however, did not meet or equal one of the listed impairments. The ALJ indicated that neither physician reported findings nor test results supported the conclusion that Plaintiff's physical impairments met or medically equaled a listing, including Listings 1.04 (Disorders of the Spine) and 11.04 (Central Nervous System Vascular Accident). Moreover, Plaintiff's mental impairments failed to satisfy the criteria of Listings 12.02 (Organic Mental Disorders) and 12.09 (Substance Abuse Disorders) and the "paragraph B" criteria.

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform light unskilled work. In making this determination, the ALJ considered all of Plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with the evidence of record. The ALJ concluded that a limitation to light unskilled work adequately addressed all of Plaintiff's limitations.

The ALJ stated that Plaintiff's testimony concerning the intensity, persistence, and limiting effects of his symptoms was not entirely consistent or fully supported by the evidence of record and his course of conduct. The ALJ found that, although Plaintiff's stroke caused significant issues, Plaintiff recovered almost completely from any disabling

effects within a short period of time. The ALJ noted that Plaintiff's impairments responded positively to recommended treatments—when he complied with them.

The ALJ stated that he gave significant weight to the state agency physicians' opinion that Plaintiff could perform light work. He noted that their opinions were consistent with Dr. Inabnit's consultative examination report and with the medical evidence of record, which showed that most of Plaintiff's symptoms following his stroke had resolved. The ALJ also explained that Plaintiff's back pain had improved with treatment (stretching exercises and medication).

The ALJ also indicated that he gave weight to Dr. Katariwala's objective examination findings but not to his conclusions, which were inconsistent with his examination findings and with the medical evidence of record. The ALJ stated that Dr. Katariwala's opinion that Plaintiff was permanently disabled was a legal opinion not entitled to any weight.

As to Plaintiff's mental RFC, the ALJ indicated that he adopted the opinion of the state agency psychologists, who concluded that Plaintiff could carry out and sustain simple, repetitive tasks. The ALJ noted that this opinion was consistent with Dr. Heroldt's mental status report and the medical evidence of record.

The ALJ found that the Plaintiff was unable to return to his past relevant work, but that jobs existed in significant number in the national economy that Plaintiff could perform.

**C. Standard of Review**

The Social Security Act authorizes judicial review of final decisions made by the Social Security Agency. 42 U.S.C. § 405(g). Upon judicial review, the Court will only consider whether the ALJ's findings are supported by substantial evidence and made under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). In issuing his opinion, the ALJ must, at minimum, state his analysis of the evidence so a reviewing court can make an accurate decision. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Although an ALJ is not required to address all the evidence, "the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). In determining whether the ALJ has satisfied this burden, the Court will not re-weigh evidence or make decisions of credibility. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

**D. Disability Standard**

To qualify for Disability Insurance Benefits, the claimant must establish that he or she suffers from a disability. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration established a five-step inquiry to evaluate whether a claimant qualifies for disability benefits. A successful claimant must show:

> (1) he is not presently employed; (2) his impairment is
> severe; (3) his impairment is listed or equal to a listing in
> 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able
> to perform his past relevant work; and (5) he is unable to
> perform any other work within the national and local
> economy.

*Scheck v. Barnhart*, 357 F.3d 697, 699–700 (7th Cir. 2004). An affirmative answer leads

either to the next step or, on steps three and five, to a finding that the claimant is disabled.

*Zurawski*, 245 F.3d at 886. A negative answer at any point other than step three stops the

inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof

lies with the claimant at every step except the fifth, where it shifts to the Commissioner.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

### E. Analysis

Plaintiff claims that the ALJ erred by finding that he was not disabled within the

meaning of the Social Security Act and denying Disability Insurance Benefits and

Supplemental Security Income Benefits. Plaintiff asserts the following arguments in

support of his claim: (1) the ALJ's RFC finding is not supported by substantial evidence;

(2) the ALJ failed to make a credibility determination supported by substantial evidence;

and (3) the ALJ's finding in step five was erroneous. The Court will address each of

Plaintiff's arguments in turn.

### (1) *RFC Finding*

First, Plaintiff argues that the ALJ's RFC finding is not supported by substantial

evidence.

An "ALJ is not required to address every piece of evidence or testimony presented." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). Rather, the ALJ's RFC determination must provide a "logical bridge" between the evidence and his conclusion. *Id.* (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). In doing so, the ALJ must provide a narrative discussion describing how the medical evidence of record supports the RFC finding. SSR 96-8p. The ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

In support of his contention that the ALJ's RFC finding is not supported by substantial evidence, Plaintiff makes several arguments. First, Plaintiff argues that the ALJ failed to consider all the limitations found by the state agency doctors he credits and Dr. Inabnit. Plaintiff contends that a limitation of light unskilled work is inconsistent with their findings. The Court disagrees.

In his decision, the ALJ stated that he gave significant weight to the state agency physicians' opinion that Plaintiff could perform light unskilled work. The ALJ indicated that their opinions were consistent with both Dr. Inabnit's opinion and the medical record.

Dr. B. Whitley opined that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour workday, and push or pull without limitations. Dr. Whitley also opined that Plaintiff could frequently climb ramps and stairs, stoop, and kneel and could occasionally climb ladders, ropes, and scaffolds, balance, crouch, and crawl. Dr. R. Klion opined that Plaintiff had moderate limitations in daily activities and concentration, persistence, and

pace and mild limitations in social functioning. Dr. Klion also opined that Plaintiff spoke relevantly and coherently and was able to attend to tasks, answer simple questions, and follow directions. Dr. Klion concluded that Plaintiff had the capacity to carry out and sustain simple, repetitive tasks.

Dr. Whitley's and Dr. Klion's findings are consistent with a limitation of light unskilled work. *See* SSR 83-14 (stating that nonexertional limitations such as the inability to climb scaffolding, ropes, and poles and the inability to crawl have little or no effect on the unskilled light occupational base); *see also* SSR 85-15 (stating that the light occupational base is virtually intact if a person can stoop, kneel, and crouch occasionally and that restrictions on climbing and balancing do not ordinarily have a significant impact on the light occupational base); SSR 85-15 ("The basic mental demands of . . . unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.").

Dr. Whitley's and Dr. Klion's opinions are also consistent with Dr. Inabnit's examination report. Dr. Inabnit determined that Plaintiff's motor strength was 4/5 in both the upper and lower extremities. He also found that Plaintiff's finger-to-nose, heel-to-shin, and casual walk were normal. In addition, he concluded that Plaintiff's symptoms after his stroke had resolved over time.

The Court also agrees with the ALJ's statement that these opinions and his RFC finding are consistent with the medical evidence of record. The record indicates that one month after Plaintiff's stroke, Dr. Petersen noted that Plaintiff had recovered and was not having any difficulties, except for some mild motor dysfunction in his right hand. The

following month, Plaintiff told Dr. Edquist that he no longer had difficulty brushing his teeth and picking up small objects. Occupational Therapist Nikole Meredith opined that Plaintiff "did not have any problems with fine motor skills" (Tr. 237, 238).

As for Plaintiff's back pain, the ALJ explained that it improved with treatment. Three months after the onset of Plaintiff's back pain, Dr. Keucher indicated that Plaintiff was "quite a bit looser" and "walking a great deal more" after completing stretching exercises (Tr. 345). Two months later, Dr. Biehl recommended continued conservative treatment because Plaintiff was only experiencing "slight low back pain" that did not warrant surgical intervention (Tr. 385). By July 12, 2006, Dr. Schwartz indicated that Plaintiff was "participating in all activities without complications" (Tr. 349).

Plaintiff next argues that the ALJ ignored Dr. Miller's findings, which he claims are inconsistent with a limitation of light unskilled work. Again, the Court disagrees. The ALJ discussed Dr. Heroldt's findings and Dr. Miller's psychological evaluation more than once in his decision (*See* Tr. 19, 24). Specifically, the ALJ noted Dr. Miller's determination that Plaintiff's WMS-III scores fell into the borderline range of functioning and that Plaintiff's memory problems were not serious. Plaintiff also claims that the ALJ erred by not addressing his GAF score. However, the GAF scale is merely used to make treatment decisions. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000). "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (holding that an ALJ's failure to reference a GAF score does not make an RFC determination inaccurate).

Plaintiff also argues that the ALJ failed to state what weight he assigned to Dr. Motley's opinion, which Plaintiff indicates showed greater limitations than the ALJ's RFC determination. However, Dr. Motley never gave an opinion regarding Plaintiff's functional limitations. Rather, the record merely contains Dr. Motley's treatment notes, which indicate that Plaintiff was feeling well in June and August 2006.

Plaintiff finally argues that the ALJ failed to give good reasons for rejecting Dr. Katariwala's conclusions. This argument is without merit. The ALJ indicated that Dr. Katariwala had never seen Plaintiff before the examination on May 2, 2007, and that he did not perform any tests that day. The ALJ found that Dr. Katariwala's conclusions were inconsistent with his examination findings and with the medical evidence of record. The ALJ also noted that Dr. Katariwala's determination that Plaintiff was permanently disabled was a legal conclusion, not a medical opinion.

Accordingly, the ALJ built a "logical bridge" between the evidence and his conclusion that Plaintiff could perform light unskilled work. Moreover, the ALJ's RFC finding is supported by substantial evidence and, therefore, must be affirmed.

**(2)** *Credibility Analysis*

Plaintiff next argues that the ALJ failed to make a credibility determination supported by substantial evidence.

SSR 96-7p requires an ALJ to make a finding concerning the credibility of a claimant's statements about his or her symptoms and their functional effects. A

credibility determination must contain specific reasons supported by the record. SSR 96-7. However, an ALJ's credibility finding is given great deference and will not be overturned unless patently wrong. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).

In the present case, the ALJ concluded that Plaintiff's statements "concerning the intensity, persistence and limiting effects of his symptoms [were] not entirely consistent with or fully supported by the medical and other evidence of record, nor by his course of conduct" (Tr. 24). In support of this conclusion, the ALJ stated that the medical evidence indicated that Plaintiff recovered almost completely from the disabling effects of his stroke within a short period of time. The record supports this finding (Tr. 227–28, 252–54, 292–99, 347, 349, 351). Moreover, the ALJ explained that the medical evidence showed that Plaintiff's impairments responded to treatment when he complied with treatment recommendations. The record supports this finding as well (Tr. 234, 238, 345, 347). The ALJ also noted that Plaintiff did not always follow physical therapy recommendations and continued to smoke despite being told by physicians that quitting would significantly improve his condition.

Therefore, the ALJ's credibility determination is not patently wrong and must be affirmed because he provided specific reasons for it on the basis of the record.

**(3)** *Step-Five Analysis*

Plaintiff finally argues that the ALJ's finding in step five was erroneous. Specifically, Plaintiff asserts that the hypothetical the ALJ presented to the VE did not accurately describe his impairments. Hypothetical questions need only be supported by

the medical evidence of record to be valid. *Cass v. Shalala*, 8 F.3d 552, 555–56 (7th Cir. 1993). The ALJ determined that a limitation to light unskilled work adequately addressed all of Plaintiff's limitations. As discussed above, the ALJ's RFC determination of light unskilled work is supported by substantial evidence. The ALJ's hypothetical questions to the VE asked whether there were any jobs limited to light unskilled work and sedentary work for an individual of the same age, education, and work background as Plaintiff. Accordingly, the ALJ's hypothetical properly described Plaintiff's limitations to the VE because it was supported by the medical evidence of record.

Plaintiff also contends that the ALJ violated SSR 00-4p because he did not inquire whether the VE's testimony was consistent with the Dictionary of Occupational Titles (DOT). SSR 00-4p places an affirmative duty on the ALJ to resolve conflicts between the evidence the VE has provided and the DOT after the VE has testified. *Harris v. Astrue*, No. 2:06-CV-222, 2008 WL 410577, at *8 (N.D. Ind. Feb. 11,2008).

In the present case, the ALJ failed to inquire whether the VE's testimony was consistent with the DOT. As Plaintiff correctly points out, all the jobs that the VE indicated as being sedentary are light under the DOT. The VE also testified that the occupation of hand packager is light work, but, actually, it is medium work under the DOT. Furthermore, the job of a cable worker does not exist in the DOT. Thus, the ALJ violated his duty under SSR 00-4p to resolve conflicts between the VE's testimony and the DOT.

However, the Seventh Circuit has found that an ALJ's failure to comply with SSR 00-4p may be harmless error when a significant number of jobs remain unchallenged from the VE's testimony. *See Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008)

(holding that an ALJ's failure to ask a vocational expert if his testimony conflicted with the DOT was harmless error when the claimant could find a job as a bench hand, assembler, and office helper); *Prochaska v. Barnhart*, 454 F.3d 731, 735–36 (7th Cir. 2006) (applying harmless-error analysis to a violation of SSR 00-4p).

In this case, the VE testified that jobs as a collator operator (750 to 1,000 jobs) and a laundry sorter (1,500 to 2,000 jobs) existed in the state of Indiana. The VE's testimony that these jobs constitute light work is consistent with the DOT. The 2,250 to 3,000 jobs available to Plaintiff are a significant number of jobs. *See Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (finding 1,400 jobs significant and citing cases finding fewer than 750 jobs to be significant); *see also Wells v. Astrue*, No. 07-C-940, 2009 WL 142404, *17 (E.D. Wis. Jan. 17, 2009) (slip opinion) (finding 1,300 jobs in Wisconsin to be a significant number); *Nix v. Sullivan*, 744 F. Supp. 855, 863 (N.D. Ill. 1990) (finding that 675 jobs are significant number), *aff'd*, 936 F.2d 575 (7th Cir. 1991).

Therefore, the ALJ's failure to make an inquiry pursuant to SSR 00-4p was harmless error.

**F. Conclusion**

The Court AFFIRMS the Administrative Law Judge's decision.

SO ORDERED on September 2, 2009.

                                        s/Joseph S. Van Bokkelen
                                        JOSEPH S. VAN BOKKELEN
                                        UNITED STATES DISTRICT JUDGE
                                        HAMMOND DIVISION